GELHAAR, Plaintiff in error, v. STATE, Defendant in error.

*No. State 13. Argued March 27, 1973.—Decided May 14, 1973.*
(Also reported in 207 N. W. 2d 88.)

548

For the plaintiff in error there was a brief by *James H. McDermott,* state public defender, and oral argument by *Howard B. Eisenberg,* successor state public defender.

For the defendant in error the cause was argued by *Robert D. Martinson,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

WILKIE, J.   Five issues are raised in this review:

1. Did the trial court violate defendant's constitutional right against self-incrimination by admitting into evidence certain inculpatory statements made to a police officer shortly after the stabbing incident here involved?

2. Did the trial court properly deny defendant's motion to dismiss at the close of the state's case-in-chief?

3. Was defendant's arrest lawful?

4. Did the exclusion of defendant from an in-chambers conference held during the trial violate her constitutional and statutory right to be present at her trial?

5. Did certain conduct of the prosecutor deny defendant her constitutional right to a fair trial?

*Admissibility of inculpatory statements.*

Defendant's primary contention is that the trial court committed constitutional error by admitting certain statements into evidence during trial which had been made to an investigating police officer shortly after the stabbing incident. It is conceded that the defendant did stab her husband and the only question is the degree of homicide involved. According to the defendant, these statements went to her intent at the time of the stabbing, the absence of proper *Miranda* [2] warnings rendered these statements inadmissible at her trial and their admission must result in a reversal of the judgment of conviction.

[2] *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694.

The sequence of events leading up to defendant's making the statements began, according to Milwaukee Police Officer Allan Kedzierski, when he received a radio dispatch at approximately 1:04 a. m. on the morning of April 20, 1966. Arriving with his partner at the Gelhaar residence at "approximately 1:10 a. m.," he testified, he observed a police ambulance backed into the driveway and a white male upon a stretcher being placed therein. Without speaking to the ambulance officers, Kedzierski testified, he walked into the living room of the house via the front door. Met by one of the Gelhaar children, he asked the child where the mother was. Upon the child's response, Officer Kedzierski walked through the kitchen and out the side door where he observed the defendant, standing on the driveway, "crying and quite excited." Kedzierski also testified that as he left the house he noticed a butcher knife on the concrete step adjacent to the side door.

Officer Kedzierski testified at trial that as he approached the defendant, in full uniform, she blurted to him with her face in her hands " 'I didn't mean to do it, I didn't mean to do it, I'll give him all my blood.' " According to Kedzierski he yet was not sure what had occurred but, attempting to comfort the defendant, asked her if she desired to go inside and sit down. The defendant indicated she did not and the officer "asked her what happened, just what had happened here." Kedzierski testified that he held defendant's arm to steady her and she in turn held on to him. Upon some questioning, according to Kedzierski, the defendant essentially related that she and her husband had been arguing during a drive home from a dance. They arrived home where her husband temporarily locked defendant out of the house. Eventually he permitted her entry and they continued to argue in the kitchen. According to the officer:

"She then said that she went inside and they sat down and they had a beer, they started drinking a beer, and he started to argue with her some more. And in the course of their argument there was a time that came when he said to her, 'why don't you go ahead and end it all, go ahead and end my misery.' And she said then that all she can remember is picking up the knife and coming down on him."

According to Kedzierski that was the end of their conversation—such conversation lasting approximately twenty or twenty-five minutes. Officer Kedzierski reaffirmed his trial testimony at the postconviction hearing on February 18, 1972.

The defendant's own testimony contradicts the police officer's testimony in several respects. First, she testified at trial and at the postconviction proceeding that she first encountered Officer Kedzierski while she was in the kitchen of her home and that he gently but forcibly guided her outside. Second, the defendant also testified at the postconviction hearing that at all times in the presence of Officer Kedzierski she felt, in view of the fact he was wearing his uniform and such uniform represented authority, she was obligated to remain and talk with him. The defendant also testified at her postconviction proceeding that during the conversation she requested leave of the officer to visit the bathroom and that he replied " 'Let's talk.' " Officer Kedzierski acknowledged this incident but testified that in response to her request he asked if she could wait as no one was allowed back into the house. According to Kedzierski, the defendant replied " 'I can wait.' "

Essentially, it is defendant's position that Officer Kedzierski ought to have advised her of her rights before questioning her, and his failure to do so rendered his testimony as to the statement he claimed she said her husband made to her "Why don't you go ahead and end it all, go ahead and end my misery," and as to her

statement to the officer that "all she [defendant] can remember is picking up the knife and coming down on him" inadmissible at her trial.

*Miranda* was decided June 13, 1966, two months after the statements were given to the police officer at the Gelhaar home shortly after the stabbing incident, but eight months before the 1967 trial. The *Miranda* requirements apply to all trials actually held after that 1966 decision; accordingly, *Miranda* was applicable at the time of the "questioning," provided there was "custodial interrogation" as prescribed by that decision.[3] *Miranda* requires that a defendant must be advised of certain rights among which is the right to remain silent, prior to the institution of custodial interrogation by law enforcement officers. Thus *Miranda* states:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.*" (Emphasis added.) [4]

The narrow question to be decided here is whether the inculpatory statements made by the defendant were made during "custodial interrogation." One well-known legal scholar has said:

"Probably the most difficult and frequently raised question in the wake of *Miranda* is what constitutes the 'in-custody interrogation' or 'custodial questioning' which must be preceded by the *Miranda* warnings." [5]

[3] *See Johnson v. New Jersey* (1966), 384 U. S. 719, 86 Sup. Ct. 1772, 16 L. Ed. 2d 882; *Reimers v. State* (1966), 31 Wis. 2d 457, 465, 143 N. W. 2d 525, certiorari denied, 385 U. S. 980, 87 Sup. Ct. 528, 17 L. Ed. 2d 442.

[4] *Miranda v. Arizona, supra,* footnote 2, at page 444.

[5] Kamisar, *"Custodial Interrogation" Within the Meaning of Miranda,* in 1 Criminal Law and the Constitution (1968), 335.

It is acknowledged that the defendant was not formally arrested and had not "been taken into custody." Defendant argues, however, that she was so significantly "deprived of [her] freedom" during the conversation with Officer Kedzierski as to fall within the *Miranda* definition of custodial interrogation to mean a person who is "otherwise deprived of his freedom of action in any significant way."

Here the trial court, after an extensive hearing which preceded the trial, made extensive findings to the contrary. These findings are as follows:

"The second witness, with respect to the scene outside of the house, where he encountered the defendant, is similarly totally unaccompanied by any custody of any kind, under any decision that I know of. There is no significant restraint of liberty, no physical custody, and not even insignificant custody at either of the scenes by the officers who testified. This was under the auspices of the milieu of her own home environment, as has been stated by counsel for the state, in the constructive presence of her children at her home and in the immediate vicinity, and there is nothing here that gets close to the *Miranda* proscription.

"I have no doubt whatsoever, and I so find, beyond all reasonable doubt, that there are no factual circumstances exposed here which require the warnings or the waiver indicated in the *Miranda* decision, so far as any statements made. These were all statements that were made not in custody, not in even insignificant restraint of liberty, and not the subject of interrogation, except the one statement that the officer made, 'what happened,' and that wasn't coupled with custody in even the loosest sense.

"I find that the factual circumstances here do not, beyond all reasonable doubt, do not involve any version, even in the slightest, of custodial interrogation. And I conclude that the *Miranda* decision does not preclude any of the statements."

*See also: United States v. Hall* (2d Cir. 1969), 421 Fed. 2d 540, 541, certiorari denied (1970), 397 U. S. 990, 90 Sup. Ct. 1123, 25 L. Ed. 2d 398.

We are concerned on this review with whether those findings "are against the great weight and clear preponderance of the evidence." [6] All on-the-scene questioning by police officers need not be preceded by *Miranda* warnings:

"Our decision is not intended to hamper the traditional function of police officers in investigating crime . . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." [7]

In *United States v. Gibson,* the Fourth Circuit Court of Appeals held a conversation which transpired between a Virginia state police trooper and a defendant on a sidewalk in front of a tavern not to constitute custodial interrogation within *Miranda's* contemplation.[8] Although the trooper asked several questions without giving Miranda warnings, the court stated:

"This court does not read *Miranda* as requiring officers to preface with a warning all non-coercive questioning conducted in the course of a routine investigation as in the circumstances of this case." [9]

According to the court the evils present in *Miranda* were not present in the case before it, "[n]or do we perceive in the record any element of accusation, decep-

---

[6] *State v. Carter* (1966), 33 Wis. 2d 80, 91, 146 N. W. 2d 466, certiorari denied, 387 U. S. 911, 87 Sup. Ct. 1696, 18 L. Ed. 2d 630. *See also: Sharlow v. State* (1970), 47 Wis. 2d 259, 265, 177 N. W. 2d 88; *McClellan v. State* (1972), 53 Wis. 2d 724, 728, 193 N. W. 2d 711.

[7] *Miranda v. Arizona, supra,* footnote 2, at page 477. *See also: United States v. Thomas* (2d Cir. 1968), 396 Fed. 2d 310, 314; *Allen v. United States* (D. C. Cir. 1968), 390 Fed. 2d 476, 479.

[8] (4th Cir. 1968), 392 Fed. 2d 373.

[9] *Id.* at page 376.

tion, suggestion, or other tactics calculated to over-awe . . . ." [10]

A similar interpretation obtained in *Utsler v. Erickson,* wherein a *Miranda* challenge was presented to the Eighth Circuit Court of Appeals.[11] Holding a brief conversation between South Dakota law enforcement officers and the defendant relating to his recent movements not to constitute custodial interrogation, the court stated:

". . . The police in investigating a probable offense may ask preliminary questions on identification and the recent whereabouts of persons under suspicion in order to proceed with the investigation and quickly eliminate those who appear to be beyond suspicion. The police should be able to do this without accusing a person of committing a crime and thus possibly subjecting that person to an unfair accusation. And this type of questioning should be permitted without giving a recitation of the *Miranda* warnings.

"Preliminary inquiry in the field is needed to immediately separate those individuals who by force of circumstances might give some indication of being connected with or having knowledge of an alleged offense from those who do not. The question asked did not seek to intimidate nor secure any admission or confession from the petitioner, but only sought to ascertain if further investigation should ensue. This was not a custodial interrogation." [12]

In *Roney v. State* [13] this court considered the nature of custodial interrogation under *Miranda*. *Roney* involved an on-the-spot investigation of a suspiciously parked automobile in the early morning hours. In *Roney* this court held that general questions of identification and car ownership did not constitute custodial interrogation. Referring to several portions of the *Miranda* opinion, we stated:

[10] *Id.*

[11] (8th Cir. 1971), 440 Fed. 2d 140, certiorari denied, 404 U. S. 956, 92 Sup. Ct. 319, 30 L. Ed. 2d 272.

[12] *Id.* at page 143.

[13] (1969), 44 Wis. 2d 522, 171 N. W. 2d 400.

". . . The defendant was not taken from familiar surroundings. He was not stopped. The place where he was found and where the admission was made was completely of his own choosing, and the evidence which he did not seek to controvert was that he was free to leave. *The overwhelming atmosphere of a custodial or in-station interrogation was totally absent.*" (Emphasis added.) [14]

The trial court properly found that the atmosphere of a "custodial or in-station interrogation was totally absent." The defendant made her statements during her conversation with Officer Kedzierski during the period right after the stabbing when she talked with him at her home. We conclude that the findings to the effect that there was no custodial interrogation are not against the great weight and clear preponderance of the evidence. It is true that the statements were made at the end of a twenty-five minute period of "questioning." This length of time alone does not mean that the defendant was otherwise deprived of her freedom of action in any significant way.

### The motion to dismiss.

Defendant contends that the trial court violated its duty and her constitutional rights by failing to plainly rule that the evidence before it at the close of the state's case-in-chief was sufficient to support a finding of guilt beyond a reasonable doubt as to the offense of first-degree murder charged in the information. The trial court stated:

"I am not sure what ultimately the picture may finally be, but it is quite clear to me from the evidence, beyond all reasonable doubt, that the state *has proved the offense charged, or included offenses which can be considered by the jury.* And on the present state of the record, it would

[14] *Id.* at page 531.

appear to me that the offense charged would be a jury issue, also, at this time, because under the principle and theory that a person, unless there are circumstances to rebut the presumption, intends all of the usual and probable and natural consequences of deliberate acts, a reasonable person so does. And, consequently, on the face of the record now, I think the state has established the offense charged and, certainly beyond any question of doubt, an included offense or offenses. So the motion is denied." (Emphasis added.)

The defendant's contention must fail for two reasons: First is her failure to assert it at the trial court; [15] and second, the trial court did unequivocally hold, pursuant to *Welsher v. State* [16] and *State v. Gresens,* [17] that the evidence in the instant case proved beyond a reasonable doubt "that the state has proved the offense charged." We do not see the implications that defendant reads into the court's subsequent clause "or included offenses which can be considered by the jury." The trial court's ruling was adequate.

### The arrest.

Defendant's third contention is that her arrest was illegal. She argues the complaint upon which the criminal warrant was bottomed was defective because it predominantly relied upon certain inculpatory statements made to Detective Orlikowski which were inadmissible at trial for lack of compliance with *Miranda.* The prosecuting attorney at defendant's trial acknowledged, at the postconviction hearing, that Orlikowski did not testify at trial because he did not give proper *Miranda* warnings and the statements made to him by defendant would have been inadmissible. Defendant

[15] *See e. g., State v. Schneidewind* (1970), 47 Wis. 2d 110, 119, 176 N. W. 2d 303.

[16] (1965), 28 Wis. 2d 160, 166, 135 N. W. 2d 849.

[17] (1968), 40 Wis. 2d 179, 161 N. W. 2d 245.

argues her arrest, bottomed upon such inadmissible statements stated in the complaint, was unlawful.

As with the preceding contention, defendant has waived her objection to this alleged defect in the complaint by not raising it prior to trial.[18] In addition, *Miranda* nowhere prohibits the use of admissions which have been the product of custodial interrogation instituted by police absent proper warnings as the basis for issuing a complaint. *Miranda* excludes such evidence *from trial:*

". . . But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." [19]

In view of the recent supreme court decision permitting the use of statements made to police officers despite the lack of *Miranda* warnings for purposes of impeachment,[20] it stands to reason that such assertions, if reliable, may also be utilized as the foundation for a complaint. Reliable hearsay may also form the basis of criminal complaints although it may be inadmissible at trial.[21]

### The in-chambers conference.

Defendant also contends that her exclusion from an in-chambers conference and a bench conference during her trial violated both her constitutional and statutory rights to be present at trial.[22] This court has dealt

[18] Sec. 955.09 (3), Stats. 1965. *See also: Williams v. State* (1969), 45 Wis. 2d 44, 49, 172 N. W. 2d 31.

[19] *Miranda v. Arizona, supra,* footnote 2, at page 479.

[20] *See Harris v. New York* (1971), 401 U. S. 222, 226, 91 Sup. Ct. 643, 28 L. Ed. 2d 1.

[21] *See State v. Camara* (1965), 28 Wis. 2d 365, 374, 137 N. W. 2d 1.

[22] Wis. Const. art. I, sec. 7. *See also:* sec. 971.04 (1) (a), Stats.

with this objection on several occasions. While trial courts have been admonished to be "solicitous" in allowing defendants to be present at conferences in chambers,[23] this court, citing *Snyder v. Massachusetts*,[24] has held "[i]f a fair and just trial would be thwarted by his absence, his presence is mandatory." [25]

In the instant case, after the defendant's postconviction hearing, the trial court summarized and commented upon the evidence concerning the in-chambers and bench conferences as follows:

> "*The Court:* This is before the testimony, then—or, rather, the testimony that follows that in open court in the presence of the jury and the defendant involves the testimony of Gordon Adamczewski, who is a police officer, called by the state. There is no indication of what that 'At Bench' conference involved either from the flow of the testimony of the witness or from any comment by counsel or the court concerning the same. Mr. Wiener did specifically testify he had no recollection of what the contents of that conference was 'at the Bench,' but he did specifically testify, without being able to remember the details of that conference, that as to all conferences—in chambers or at the bench, that no matters were discussed that went to the guilt or innocence of the defendant, that was his testimony, but they were merely dealing solely with questions of law or preliminary matters of procedure, or conferences affecting schedule. And I am satisfied from the complete record that there was nothing here that caused any injustice to the defendant or entitled the defendant to participate in any of those conferences. And without attempting to testify, but stating for the record very clearly and firmly, the court would not have tolerated the presentation of any material in private chambers con-

[23] *Ramer v. State* (1968), 40 Wis. 2d 79, 85, 161 N. W. 2d 209, certiorari denied (1969), 394 U. S. 989, 89 Sup. Ct. 1476, 22 L. Ed. 2d 764.

[24] (1934), 291 U. S. 97, 54 Sup. Ct. 330, 78 L. Ed. 674.

[25] *State v. Clarke* (1970), 49 Wis. 2d 161, 176, 181 N. W. 2d 355. *See also, Johnson v. State* (1971), 49 Wis. 2d 455, 462, 182 N. W. 2d 502.

ferences that would have in any wise affected the guilt or innocence of this defendant. The court has never done so and never will. And, as I said before, Mr. McDermott has finally converted me into a program of complete abstinence from 'in chambers' conferences. You see, at the time of this trial I had not experienced his ardor and his manifest distaste for 'in chambers' conferences without him knowing what occurred therein. And if I had known that at the time I would have certainly appropriately embroidered this transcript with a further elucidation of exactly what had transpired at those conferences into the record.

"But so far as this hearing is concerned and so far as the transcript of the testimony at the trial is concerned, I am completely satisfied that the defendant in this hearing, on the basis of the testimony at the trial and on the basis of the evidence adduced at this hearing,—there is no evidence here introduced or reflected in the transcript of the original proceedings or the testimony today which indicates to me that a fair and just trial was thwarted by the absence of the defendant at any of the conferences referred to. As a matter of fact, there is not a single scintilla of evidence in that respect. The defendant hasn't established her burden on the basis of her motion at this hearing, and the motion is completely denied affecting that issue on all grounds and all points referred to in the post-conviction motion."

In view of this finding by the trial court and the total absence of any showing by defendant that such conferences "thwarted" her right to a fair trial, we conclude that such finding is not against the great weight and clear preponderance of the evidence.[26]

*The prosecutor's conduct.*

Defendant's final contention involves a question asked of defendant's daughter which, it is argued, was a ploy designed to destroy defendant's right to a fair trial.

[26] *See e. g., State v. Carter, supra,* footnote 6, at pages 90, 91; *Schwamb v. State* (1970), 46 Wis. 2d 1, 11, 173 N. W. 2d 666.

The incident involved occurred during the presentation of the state's case-in-chief wherein the prosecutor addressed Christine Tveten, defendant's daughter, as follows:

"*Q.* You advised me out in the hall prior to—or, this morning, that you would refuse to answer any questions I asked you, out there in the hall, isn't that true?
"*Mr. Wiener:* I object to that question, Your Honor. This is immaterial. This is his own witness.
"*The Court:* Sustained.
"*Mr. McCann:* No further questions.
"*Mr. Wiener:* I ask that the question be stricken, Your Honor—well, it wasn't a question, it was a statement.
"*The Court:* It is stricken, and the jury is instructed to disregard the last question, which was not answered, and objected to by counsel for the defense. The objection is sustained, that question has been stricken, and the jury is instructed to disregard completely the same as though it had never been asked here in this court.
"*Mr. McCann:* No further questions.
"*Mr. Wiener:* I have no questions, Your Honor."

In *Harris v. State,* this court stated that it is a question of fact as to whether remarks of witnesses or attorneys are sufficiently prejudicial to warrant a new trial.[27] The court noted the case for granting a new trial is much stronger where the remark goes "directly to the issue of guilt." [28] Where, however, the remarks do not go to the issue of guilt the court held proper other considerations:

"In such determinations, the curative effect of the court's admonition to the jury to disregard the evidence may be considered." [29]

The court further noted in *Harris* the evidence of guilt was so strong and convincing that it rendered harmless the potential harmfulness of the remark.

[27] (1971), 52 Wis. 2d 703, 191 N. W. 2d 198.
[28] *Id.* at page 705.
[29] *Id.* at pages 705, 706.

In the instant case the curative instruction was both forceful and immediate. While the prosecutor's remark was hardly in the spirit of fairness, it cannot be said to have unduly prejudiced the defendant. Additionally, in view of the overwhelming evidence of guilt in the instant case, the remark was harmless beyond reasonable doubt.

*By the Court.*—Order affirmed.