Wilson, Plaintiff in error  v. State, Defendant in error.

*No. State 117.   Argued May 1, 1973.—Decided June 18, 1973.*
(Also reported in 208 N. W. 2d 134.)

272

For the plaintiff in error there was a brief by *James H. McDermott,* former state public defender, and *Howard B. Eisenberg,* acting state public defender of counsel, a reply brief by *Howard B. Eisenberg,* state public defender, and oral argument by *Mr. Eisenberg.*

For the defendant in error the cause was argued by *Robert D. Martinson,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

WILKIE, J. Several issues are raised by this review, as follows:

1. Did the trial court lack jurisdiction over the attempted armed robbery charge on the ground that the information failed to allege such a crime?

2. Did the trial court err in denying Wilson's motion challenging the 1971 Kenosha county circuit court jury list?

3. Did the trial court err in failing to submit to the jury a verdict of third-degree murder?

4. Was Wilson denied his right to be present at trial as a result of numerous bench conferences?

5. Did the trial court commit prejudicial error in admitting alleged irrelevant tape-recorded statements of Wilson?

6. Did the trial court commit prejudicial error in its inadvertent use of the term "mental conduct" rather than "criminal conduct" in its instructions on a person's mental responsibility for criminal conduct?

7. Was Wilson's right to confrontation violated at the preliminary examination as a result of restrictions placed upon his cross-examination of a state witness?

8. Was the closing argument of the special prosecutor so prejudicial as to deny Wilson a fair trial?

### 1. The information.

The second count in the information alleged that Wilson did:

". . . feloniously, with intent to steal and while armed with a dangerous weapon, to wit, a pistol, attempt to take property from the person of John T. Kennedy by use of force; contrary to the provisions of Section 939.32 and 943.32 (1) (a) and (2), Wis. Stats."

Wilson contends this information fails to allege that he had the intent to perform acts of armed robbery, that he did perform such acts, that he attempted to take property from the person in possession, and that he attempted to use force against the person in possession to overcome the latter's physical resistance. Citing *Champlain v. State,*[1] he claims the court thus lacked jurisdiction and the attempted armed robbery conviction must be reversed. Without filing a petition for confession of error, the state "concedes that the information is probably insuf-

[1] (1972), 53 Wis. 2d 751, 193 N. W. 2d 868.

ficient to charge the offense of attempted armed robbery, under *Champlain* . . . ."

The state was not justified in making this concession. In *Champlain* the defendant was convicted of armed robbery, theft, and burglary. The information on the armed robbery count alleged that the defendant did:

"With intent to steal, take property from the person, presence of the owner . . . while armed with a dangerous weapon, contrary to Section 943.32 (2) of the Wisconsin Statutes . . . ." [2]

This court held that this information failed to allege armed robbery because there was no allegation of the use or threat of force. The state took the position that although no armed robbery was alleged because of no allegation of force, attempted theft from the person was alleged. The court rejected this argument because there was no allegation of attempt. All that was alleged was a completed act of taking; the information failed to "charge all the elements of theft or attempt by way of the intention to perform the acts and attain a result which would constitute theft, and which would have been completed except for some intervening force or factor." [3]

What Wilson is in effect arguing is that the above-quoted language means the allegation that he did "attempt to take property from the person of John T. Kennedy" is an insufficient allegation of attempt; that instead, it should have been alleged that he performed acts which, but for some intervening force, would have constituted the crime and that he intended to perform such acts. In *Champlain* the information did not contain any reference to the word "attempt" or to any acts which would constitute an attempt without specifically labeling them as such. In drafting an information the state should not have to spell out every act which would com-

---

[2] *Id.* at page 753, note 1.

[3] *Id.* at page 754.

prise an element of the crime;[4] instead, an allegation of the element should suffice. The same is true with respect to Wilson's claims of deficiency in allegations of intent and use of force.

Under sec. 943.32 (1) (a) and (2), Stats.,[5] the elements of an armed robbery are (1) an intent to steal, (2) a taking of property from the person or presence of the owner, (3) by use of force, and (4) while armed with a dangerous weapon. An information alleging an attempted armed robbery should contain these elements plus an allegation of attempt.

The information in this case alleged that Wilson did (1) with intent to steal, (2) while armed with a dangerous weapon, (3) attempt (4) to take property from the person of another (5) by use of force. Thus, all the elements of armed robbery plus the additional allegation of "attempt" are present. The information was sufficient.

## 2. Challenge to the jury list.

Several weeks prior to trial, Wilson moved for a hearing on why the then current jury list for Kenosha

---

[4] Sec. 939.32 (2), Stats., provides: "An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor."

[5] Sec. 943.32, Stats. "**Robbery.** (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means may be imprisoned not more than 10 years:

"(a) By using force against the person of the owner with intent thereby to overcome his physical resistance or physical power of resistance to the taking or carrying away of the property; . . .

". . .

"(2) Whoever violates sub. (1) while armed with a dangerous weapon may be imprisoned not more than 30 years."

county should not be deemed void and a new list prepared. Late in September, 1971, a hearing was held on the challenge before Judge BODE.

At the hearing, Wilson claimed the jury commissioners systematically excluded from the jury list blacks and people in the twenty-one to twenty-four and twenty-five to thirty-four-year-old age groups. In support of this claim, he presented testimony of Dr. Roland J. Derenne, an associate professor of sociology at the University of Wisconsin—Parkside. Dr. Derenne had compared the percentage of persons on the jury list in three different age groups with the percentage of persons in the age groups in Kenosha county as disclosed in the 1970 census. He accomplished this by taking a 10 percent random sampling of persons on the jury list for 1969 through 1971, calling them up and determining their age and race. His findings can be summarized as follows: The census showed that in 1970 there were 68,515 persons in Kenosha county over twenty-one years of age, of which

9.7 percent were in the 21–24 year old group
21.1 percent were in the 25–34 year old group
69.2 percent were in the 35 and over group

The 1969 jury list contained 434 persons. Derenne called 43 of these people and found that among the 43 he called

None were in the 21–24 year old group
4.7 percent (or two people) were in the 25–34 year old group
95.3 percent (or 41 people) were in the 35 and over group

In the 1970 jury list, on which there were approximately 1,000 names to be placed in the tumbler, approximately 100 persons were called, of which

1.0 percent were in the 21–24 year old group
13.9 percent were in the 25–34 year old group
85.1 percent were in the 35 and over group

The 1971 jury list contained approximately 1,058 persons. Derenne called approximately 105 of these and found that among those called

2.8 percent were in the 21–24 year old group
16.8 percent were in the 25–34 year old group
80.4 percent were in the 35 and over group

On the basis of these figures alone, Wilson claims people in the twenty-one to twenty-four and twenty-five to thirty-four-year-old age groups were underrepresented over a period of time.

On cross-examination, Derenne admitted he did not break down the population figures in terms of percentage of people in each age group who were qualified to serve as jurors, and did not determine how many people were qualified electors in the various age groups. He conceded that the underrepresentation might be due to the fact that persons in the lower age groups were not electors or otherwise qualified to serve as jurors.

On the issue of underrepresentation of blacks, Dr. Derenne testified that there were 117,917 people (including children) in Kenosha county. Of this total:

115,623 or 98.05 percent were white
1,930 or 1.64 percent were black
364 or .31 percent were other races

His 10 percent sampling of the jury lists for 1969 through 1971 showed that of those called:

In the 1969 list, there were no blacks and no other races
In the 1970 list, there were no blacks and one Mexican
In the 1971 list, there was one black and one Mexican

The state then called the two jury commissioners who were responsible for supplying names for the circuit court jury list. John A. Beni, aged fifty-nine, testified that he started with polling lists and from there picked people he knew to be impartial, alert, and of good moral character. He tried to get people from both sexes and

of all nationalities, races, and vocations; but he did not consider age other than to get people he considered mature. In his words:

". . . I tried to get people who are mature, and especially for females, I tried to avoid, like, young mothers who have three or four young children; and some of the young lads who are going to school and working at the same time, which might be kind of a difficult way for them to serve on a jury. If possible, I try to avoid those."

Although he did not intentionally omit people in the twenty-one to twenty-four age group, of the 800–850 names he submitted for the 1971 list there were possibly five or six persons known to him to be in the twenty-one to twenty-four-year-old group. Four or five of these were girls who bowled with his wife; on cross-examination he admitted he only believed them to be under twenty-five but could not be sure. He knew of "quite a few" people in the twenty-five to thirty-four age group on the list, but could not name any on the spot.

George L. Schlitz, aged sixty-three, was the other jury commissioner who supplied the remaining 200 names on the 1971 jury list. His method of selecting potential jurors was to write down the name of anyone he came across who he believed would make a good juror and later check the person out for qualifications. If that method did not produce enough names, he would take a polling list to town officials and ask them who they thought would make good jurors. He never inquired as to any juror's age because he knew of no qualification that a person had to be a certain age other than over twenty-one in order to serve on the jury. He did not know of any people on his list under twenty-five, but knew of "a couple" of people around twenty-five years of age.

On the issue of black jurors, Beni testified that there were eight blacks known to him in the 800 names he submitted for 1971, and there might have been more he picked from the polling lists without knowing their

race. Schlitz did not know of any blacks in his 1971 list of 200, but did not know of any blacks who resided in his district, which was rural.

Following the hearing, the trial court decided that Wilson had not met his burden of establishing a prima facie case of discrimination by merely showing lack of proportional representation as disclosed by the 10 percent sampling. Consequently, Wilson's motion was denied.

In the past five years, several cases have dealt with the issue of claimed systematic exclusion of certain groups from jury lists. In *State v. Bond* [6] the defendant claimed that Milwaukee county's use of poll lists to select prospective jurors resulted in an unrepresentative jury list. Rejecting this argument, this court held the poll lists to be a reasonable basis for selection since a juror must be an elector. Noting that "[a] defendant challenging the validity of the jury array has the burden of establishing a prima facie case of discrimination," [7] this court found the record to be devoid of evidence that the poll lists were "discriminative, either by calculation or by chance." A defendant is not entitled to a perfectly apportioned representation but only to "a fair jury from a panel selected without regard to race or other discriminatory factors." [8] In *State v. Holmstrom* [9] the defendant challenged the Eau Claire county jury array on the ground that there were few jurors under forty-five years of age. The three jury commissioners testified that they picked names from among people with whom they were personally acquainted. One admitted there were very few persons between twenty-five and thirty-five on the panel and explained this by stating that jury service worked a financial hardship on young families.

[6] (1969), 41 Wis. 2d 219, 163 N. W. 2d 601.

[7] *Id.* at page 226.

[8] *Id.* at page 227.

[9] (1969), 43 Wis. 2d 465, 168 N. W. 2d 574.

On appeal, this court noted that *Bond* placed the burden of establishing a prima facie case of discrimination upon the defendant. The court quoted *United States v. Mirabal Carrion:* [10]

" '[B]efore a jury panel can be quashed on the ground that a cohesive group has been excluded, there must be a clear showing of an intentional and systematic exclusion of said group . . . disproportion in the ultimate composition . . . furnishes no basis whatsoever for an inference of exclusion.' "

In *Holmstrom* this court concluded:

"[T]o succeed on a challenge to the jury array the defendant must show:
"(1) A systematic exclusion;
"(2) Of some representative unit of citizens.
A systematic exclusion can be shown by the direct testimony of the jury commissioners or by proving a disproportionate representation of a unit of citizens on the jury array over a period of time." [11]

Systematic exclusion of young people was held to be a ground for challenge. "Once the defendant presents a prima facie case of discrimination, the burden shifts to the prosecution." [12] But the court did not reach the issue of whether the state met its burden because the defendant was held not to have established a prima facie case. The commissioners' failure to recommend college students at a time when the voting age was twenty-one was held to be based on reason and common sense.

In *McKissick v. State* [13] this court held that the defendant did not meet his burden of establishing a prima facie case by merely asserting exclusion of blacks with-

[10] (D. C. Puerto Rico 1956), 140 Fed. Supp. 226, 229, 230. *Holmstrom,* at page 472.

[11] *Holmstrom,* at page 472.

[12] *Holmstrom,* at page 471.

[13] (1971), 49 Wis. 2d 537, 182 N. W. 2d 282.

out presenting any evidence thereof. Citing *Cassell v. Texas*,[14] the court stated: ". . . The mere lack of proportional representation of races on a jury panel does not constitute discrimination." Citing *Swain v. Alabama*,[15] the court stated that an accused is " 'not constitutionally entitled to demand a proportionate number of his race . . . on the venire or jury roll from which petit jurors are drawn.' " Similarly, in *State v. Zdiarstek*[16] this court held the defendant did not meet his burden by merely asserting that younger persons were excluded, and citing *Bond*, upheld the county's selection of jurors from poll lists.

Most recently, in *Brown v. State*,[17] this court rejected a claim of unlawful exclusion of eighteen to twenty-one year olds because the jury commissioners had to be given a reasonable time to adjust their lists to the recently lowered voter age. Further, the defendant in *Brown* was held to have waived his claim of the exclusion of teachers by failing to raise the issue prior to the impaneling of the jury. This court stated:

". . . The mere lack of a proportional representation has not been regarded as constitutionally deficient, and indeed, it has been held that an accused has no constitutional right to a jury composed of members, or having even a single member, of his or her class, race, or sex."[18]

The following rules can be summarized from these cases:

(1) The party challenging a jury array has the burden of proving a prima facie case of discrimination.

(a) He must do so prior to the impaneling of the jury.

[14] (1950), 339 U. S. 282, 70 Sup. Ct. 629, 94 L. Ed. 839; *McKissick*, at page 543.

[15] (1965), 380 U. S. 202, 85 Sup. Ct. 824, 13 L. Ed. 2d 759; *McKissick*, at page 543.

[16] (1972), 53 Wis. 2d 776, 193 N. W. 2d 833.

[17] (1973), 58 Wis. 2d 158, 205 N. W. 2d 566.

[18] *Id.* at page 165.

(b) He may meet this burden by showing an intentional and systematic exclusion of some representative class (including age, race, and sex) by

(i) Direct testimony of the jury commissioners, or

(ii) Proof of a disproportionate representation on the array over "a period of time."

(2) Once the challenger establishes a prima facie case, the burden shifts to the state, which must then show that the disproportion was not intentional or systematic.

Wilson claims he has made out a prima facie case of systematic exclusion by showing "a disproportionate representation of a unit of citizens on the jury array over a period of time"—three years.

Even though it might be concluded that the sampling conducted did not make out a prima facie case of disproportionate representation of the twenty-one to twenty-four and twenty-five to thirty-four age groups, there is no question but what the state clearly met its burden in showing no systematic exclusion. Both jury commissioners used a system of selection like that used by the commissioners in *Holmstrom*—*i.e.*, they picked names primarily from among people with whom they were acquainted. Both testified they did not consider age or intentionally omit young people. Nothing other than underrepresentation of young people would indicate that they did systematically exclude a unit of citizens. But disproportion alone, as the earlier cited cases point out, is not sufficient to show discrimination.

The claimed exclusion of blacks is without merit for the fundamental reason that there was a failure to make out a prima facie case. Trial counsel for Wilson conceded this. First, the percentage of blacks required (1.64 percent) is so small that one different answer (two instead of the one found) could entirely change the result. Because there was one black found in the 100 people sampled, the list was only .64 of a person short. Second, one jury commissioner knew personally of at least eight

black people of the 800 he submitted for the jury list and testified there could be more taken from polling lists whom he did not know. Finally, the census comparison of blacks to whites included children, and thus there was no accurate basis for comparison of the number of blacks and the number of whites qualified to serve as jurors.

### 3. Submission of third-degree murder verdict.

Wilson claims the trial court committed error in failing to submit a verdict of third-degree murder in addition to the first-degree and second-degree murder verdicts which were submitted.

Sec. 940.03, Stats., provides:

**"Third-degree murder.** Whoever in the course of committing or attempting to commit a felony causes the death of another human being as a natural and probable consequence of the commission of or attempt to commit the felony, may be imprisoned not more than 15 years in excess of the maximum provided by law for the felony."

This section is a statutory codification of the common-law felony murder rule.[19]

There is no doubt that Wilson, in the course of attempting to commit a felony (armed robbery) caused the death of John T. Kennedy as a natural and probable consequence of the attempt to commit the felony. But does this entitle him under the facts to submission of a verdict for third-degree murder?

It is well settled that to justify submission of a lesser offense to the jury there must be in the evidence some reasonable ground for a conviction of the lesser and an acquittal of the greater offense.[20]

[19] *Brook v. State* (1963), 21 Wis. 2d 32, 41, 123 N. W. 2d 535.
[20] *Sweda v. State* (1932), 206 Wis. 617, 625, 240 N. W. 369; *Devroy v. State* (1942), 239 Wis. 466, 468, 1 N. W. 2d 875; *State v. Stortecky* (1956), 273 Wis. 362, 369, 77 N. W. 2d 721.

"[T]he trial court must not only find evidence for a conviction of the lesser offense, but must also conclude that there was no reasonable ground on the evidence for a conviction of the greater offense." [21]

The greater offenses submitted to the jury were first-degree murder, which requires a specific intent to kill the victim or another,[22] and second-degree murder, which requires "imminently dangerous" conduct "evincing a depraved mind, regardless of human life." [23] Under the facts of this case, where Wilson fired one shot, asked for money and then fired again, while the jury might have found no specific intent to kill, there would be no reasonable ground upon which the jury could acquit the defendant of second-degree murder. In the very recent and similar case of *Buckner v. State*,[24] the defendant in the course of an armed robbery killed one of his victims and was convicted of second-degree murder.

We conclude that there being no reasonable ground in the evidence upon which the jury could have acquitted Wilson of second-degree murder, the trial court did not err in refusing to submit a verdict of third-degree murder to the jury.

## 4. Bench conferences.

The defendant contends his right to be present at trial was violated by numerous bench conferences between the

[21] *State v. Carter* (1969), 44 Wis. 2d 151, 156, 170 N. W. 2d 681.

[22] Sec. 940.01, Stats. "**First-degree murder.** (1) Whoever causes the death of another human being with intent to kill that person or another shall be sentenced to life imprisonment.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being."

[23] Sec. 940.02, Stats. "**Second-degree murder.** Whoever causes the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not less than 5 nor more than 25 years."

[24] (1972), 56 Wis. 2d 539, 202 N. W. 2d 406.

attorneys and the judge. He relies on the early Wisconsin case of *French v. State.*[25] *French,* however, is not on point. In that case, the record failed to show the defendant's presence at the trial, the rendering of the verdict, and the pronouncement of sentence. No such absence at these critical stages is shown in this case.

In *Ramer v. State*[26] this court held that the defendant did not have a constitutional right to be present at every conference between attorneys and the court. In that case, a witness asked that he not be called. His reasons were heard by the court and attorneys in chambers without the defendant's presence. Thereafter the court ruled the witness did not enjoy a privilege, but defense counsel nevertheless excused him. Citing *French,* Ramer contended his right to be present was violated. Rejecting this argument, this court noted:

". . . When a conference in chambers deals solely with a question of law or preliminary matters of procedure, it has been held not to constitute a part of the trial in the constitutional sense."[27]

Viewing the timing of the bench conference and the context in which they were conducted, we are satisfied that a fair trial was not thwarted by Wilson's absence. Most of these involved questions of law following objections[28] or matters of procedure.[29] Many were called at

[25] (1893), 85 Wis. 400, 55 N. W. 566.

[26] (1968), 40 Wis. 2d 79, 161 N. W. 2d 209.

[27] *Id.* at page 85; *see also: Gelhaar v. State* (1973), 58 Wis. 2d 547, 207 N. W. 2d 88.

[28] For example, at one point the state sought to admit a waiver of constitutional rights into evidence. Defense counsel objected on the ground it was not relevant. The district attorney asked to comment on its relevancy and the judge asked the two attorneys to approach the bench.

[29] For example, a witness was asked whether she was watching a particular man while observing Mr. Kennedy dance. This witness proceeded to respond with a one-page narrative. The court stopped her, called the attorneys to the bench, and thereafter asked the witness to restrict her comments solely to answering the questions posed.

the behest of defense counsel.[30] Often, the court ·explained what took place at the bench conference.[31] Just as it would be impractical to consult with a defendant on every tactical move, as was noted in *State v. Harper*,[32] so would it be highly impractical to march the defendant up to the bench every time counsel objected to evidence

[30] For example, after a police officer was excused as a witness, defense counsel asked to approach the bench. At another point, where the district attorney was in the process of asking a police officer to read to the jury what he had read to the defendant, defense counsel asked to approach the bench. Again, where a doctor testified that he did not have another doctor's report, defense counsel asked to approach the bench. Thereafter the district attorney ceased asking questions about the other doctor's report.

[31] For example, the state called a witness, but no witness came forth. The district attorney then asked to approach the bench. Thereafter the court stated there would be a delay in getting the next witness to appear and called a recess. At another point, a witness was asked whether he had any conversation with the defendant at a particular time. Having answered in the affirmative, he was asked to describe the conversation. At this point, the court asked the attorneys to approach the bench. Thereafter he sent the jury into the jury room and called a conference with the defendant present. At another point, the district attorney stated he would like to file notice and asked that he and defense counsel be allowed to approach the bench. Thereafter, the court stated that the state served upon and defense counsel admitted notice that the state proposed to offer a confession or admission into evidence. At yet another point, the state asked that a police officer be permitted to play tape-recorded statements. The court asked the attorneys to approach the bench. Thereafter, the court stated that defense counsel indicated he had no objection to the playing of the tapes on the ground of voluntariness. Again, defense counsel asked for a recess and for a meeting outside the presence of the jury. After this meeting, the court stated the attorneys told him they had no more testimony for that day. Finally, the court asked· the jury whether the guilty verdict on the attempted armed robbery charge was their verdict, and they replied "Yes." The court then called the attorneys to the bench and thereafter informed the jurors that they would have to be kept together until the next day, when the matter was scheduled for completion.

[32] (1973), 57 Wis. 2d 543, 549, 205 N. W. 2d 1.

and wished to discuss the reasons for the objection with the court outside the presence of the jury.

### 5. Admission of tapes.

During the state's case in chief, three tape-recorded statements made by the defendant were played to the jury. There was no question as to their voluntariness. A waiver of constitutional rights was offered into evidence without objection to voluntariness. The only objection made was that the first two statements were irrelevant. The state argued the statements were relevant to show intent and credibility of the defendant. Without first listening to the tapes, the court allowed them to be played to the jury.

In the first statement, Wilson claimed to be at the home of Eddie Davis on the night of the alleged murder from 6:30 p. m. until the next day. At approximately 1 a. m., the morning after the shooting, according to Wilson, a man called "Sims" gave him the gun involved in the crime and he put it back on a shelf in Davis' home.

In the second recorded statement, Wilson claimed a man called "Big Daddy" set him (Wilson) up to rob Kennedy. "Big Daddy" called Wilson at 9:50 p. m. on March 26, 1971, and told him Kennedy was at a particular tavern. Wilson went to the tavern, and gave a gun he had taken from Davis' house to "Sims." Wilson then went outside and broke into a car he thought was Kennedy's. While he was doing this, he saw Kennedy and two women leave the tavern and go into another car, with "Sims" behind them. Thereafter, he heard gun shots and saw Sims run away. Wilson then ran away himself.

In the third recorded statement, Wilson claimed that after leaving a tavern he saw a man get into a car and decided to hold him up. He walked up to the man

with a gun in his hand and told the man this was a "stickup" and to give over all the money he had. When the man reached for something, Wilson hesitated and then fired a shot, telling the man to hurry and hand over his money. After the man replied that he had none, Wilson fired the second shot. The man then drove off, and Wilson put the gun in his back pocket and ran.

On appeal, Wilson claims the court committed prejudicial error in allowing these recordings to be played without first listening to them because they were irrelevant. The state argues that any possible error was harmless. Wilson replies it was not harmless because it impeached his credibility.

The court erred in allowing the recordings to be played prior to hearing their content outside the presence of the jury. As a matter of authentication, laying the foundation, and determining relevancy, the court should always listen to the tapes to determine their admissibility.[33] The question then becomes whether this error resulted in admission of irrelevant but prejudicial evidence.

There is no issue as to the relevancy of the third recorded statement, which could be admitted in the state's case in chief for purposes of showing intent and the attempted armed robbery. The only question concerns the admission of the first two statements. Because they were exculpatory in nature and contained Wilson's denial of involvement or denial of shooting, they cannot go to the matter of intent to murder or even to the fact of the attempted armed robbery. Their only obvious purpose was to impeach Wilson's credibility. While this is a

[33] *See Wright v. State* (1954), 38 Ala. App. 64, 79 So. 2d 66, certiorari denied, 262 Ala. 420, 79 So. 2d 74; Annot. (1958), 58 A. L. R. 2d 1024, 1032–1036, sec. 4, *Admissibility of Sound Recordings in Evidence.*

proper purpose, the timing was wrong since Wilson had not taken the stand at that point in the trial. In *Paulson v. State* [34] this court held that evidence of a former conviction and of other irrelevant facts tending to degrade the accused was error and could not be cured by the fact that the defendant later took the stand, thus opening the door for use of this evidence for impeachment. In the instant case, while the evidence admitted was not so grave as that in *Paulson* (where it was clearly erroneously admitted evidence of prior crimes), the first two tape recordings were admitted at a point in time when they were irrelevant.

However, in light of the overwhelming evidence of Wilson's guilt (and, in fact, defense counsel's statement upon objection to this evidence that the shooting and attempted robbery were admitted, the only question being the degree of homicide) we are satisfied that any error in this regard was not prejudicial.

### 6. *Instruction on "mental" conduct.*

Wilson contends the trial court committed prejudicial error in inadvertently instructing the jury that a person is not responsible for his "mental" conduct (rather than "criminal" conduct) if he had a mental disease or defect, etc., and that by his plea, the defendant is claiming he had such mental disease or defect so that he was not responsible for his "mental" conduct. Although defense counsel voiced no objection, the defendant now contends that this mistaken use of the word "mental" rather than "criminal" was such a plain and fundamental error as to affect his substantial rights and not require objection under *Claybrooks v. State* [35] and *Lampkins v. State*.[36]

[34] (1903), 118 Wis. 89, 94 N. W. 771.

[35] (1971), 50 Wis. 2d 79, 183 N. W. 2d 139.

[36] (1971), 51 Wis. 2d 564, 187 N. W. 2d 164.

Whether this is the type of error as would affect a substantial right is doubtful. *Claybrooks* involved the trial court's total failure to instruct on essential elements of the crime. In *Lampkins,* the court did not discuss the objections not timely raised because the error was not so plain or fundamental as to affect substantial rights. We are therefore satisfied that here no substantial rights were affected and any objections were waived.

Assuming that no objection was necessary to preserve error, the question then becomes whether the inadvertent use of the words "mental conduct" rather than "criminal conduct" is a ground for reversal. Not unless there is a showing that the jury was thereby misled.

In the early case of *Butler v. State* [37] the trial court, in giving an instruction on reasonable doubt, inadvertently stated " 'A reasonable doubt is that state of the case which . . . leaves the minds of the jurors in that condition that they *can* say that they feel an abiding conviction, to a moral certainty, of the truth of the charge.' " On appeal this court held the inadvertent use of the word "can" rather than "cannot" was no ground for reversal where the jury could not have been misled thereby, particularly in light of the other instructions on reasonable doubt. Because the judge's true meaning must have been apparent to the "ordinarily intelligent mind" no harm could be said to result from the mistake.

Similarly, in civil cases, this court has held inadvertent errors not to be a ground for reversal where the jury was apparently not misled.[38]

In the instant case, although the trial judge twice used the words "mental conduct" instead of "criminal con-

---

[37] (1899), 102 Wis. 364, 370, 78 N. W. 590.

[38] *Kruck v. Wilbur Lumber Co.* (1912), 148 Wis. 76, 133 N. W. 1117 (mistaken designation of belt); *Williams v. Hoehle* (1897), 95 Wis. 510, 70 N. W. 556 (inadvertent use of "burden of proof" rather than "preponderance of the evidence").

duct," he thereafter correctly stated "The defendant under the law has the burden that he was not responsible for the criminal conduct at the time of the crimes because he lacked substantial capacity . . . ." In light of this and the absurdity of the instruction if the trial judge had actually meant "mental" conduct, it is inconceivable that an "ordinarily intelligent mind" would have been misled.

### 7. Cross-examination at preliminary.

The defendant contends that the trial court's restriction of his cross-examination of the victim's wife at the preliminary examination was erroneous and violated his right to confrontation.

At the preliminary, Mrs. Kennedy identified Wilson as the man who shot her husband. On cross-examination, she was asked whether she described the man who shot her husband to the police. After having answered in the affirmative, she was asked by defense counsel whether she recalled how she described the person she believed shot her husband. The district attorney objected on the ground that this amounted to discovery. The objection was sustained, the court stating that counsel could go into the issue of veracity at the time of trial. The court also sustained objections to questions involving a lineup identification.

The state contends that under *State v. Knudson* [39] questions propounded by defense counsel amounted to discovery and thus were properly excluded. In *Knudson*, at the preliminary examination, the victim of the crime identified the defendant and described the incident. After the state rested, the defense called the victim, presumably adversely. The defense then attempted to call the victim's mother and the chief of police, " ' . . . to delve further into exactly what . . . [the victim] un-

[39] (1971), 51 Wis. 2d 270, 187 N. W. 2d 321.

derstood about the incident and as to statements she made at that time as to what [the defendant] said. . . .' "[40] Defense counsel was trying to get "contradictory evidence" from both the victim's mother and the police chief. On objection by the state, the magistrate refused to allow the defense to call these two witnesses. On appeal, this court upheld the ruling of the magistrate on the ground that there was no unrestricted right to call witnesses and the defense was improperly using the preliminary for discovery, citing *State ex rel. Evanow v. Seraphim* [41] (which involved a challenge to the sufficiency of a complaint) for the proposition that the:

" '. . . [I]ssue as to credence or credibility is for the trial. The hearing as to probable cause before the magistrate is not a preliminary trial. It is not the proper forum to debate and determine issues as to credibility and weight of evidence once essential facts as to probability have been established.' " [42]

In *Knudson* the court noted that the defense was attempting to "expose inconsistencies in the accounts given by the victim to various people," thereby affecting the victim's credibility. Since the defense was able to do this on its "adverse" examination of the victim, the court found the defendant not to be prejudiced by being prevented from calling additional witnesses who would possibly shake the victim's credibility.

*Knudson* stands for the proposition that there is no unrestricted right to call other witnesses for the purpose of destroying the credibility of the state's witnesses and fishing for elements of the state's case.

In the later case of *State ex rel. Hanna v. Blessinger* [43] the issue before the court was whether there was sufficient credible evidence to bind the defendant over for

[40] *Id.* at page 279.
[41] (1968), 40 Wis. 2d 223, 228, 161 N. W. 2d 369.
[42] *State v. Knudson, supra,* footnote 39, at page 280.
[43] (1971), 52 Wis. 2d 448, 190 N. W. 2d 199.

trial. Only one witness (the victim of the battery) testified. His testimony was to the effect that Hanna had struck him, although the witness had not seen him deliver the actual blow as he (the victim) was facing the other direction. Hanna claimed this testimony was conclusory in nature and not credible. Citing *State ex rel. Tessler v. Kubiak*,[44] this court stated that the examining magistrate "has the duty of determining the credibility of the witnesses and the weight to be given to their testimony." [45] The *Tessler* case involved conflicting testimony by police officers and by the appellant. The examining magistrate chose to believe the police officers. Upholding this decision, the court stated:

". . . The examining magistrate had the duty of determining the credibility of the witnesses and the weight to be given to the testimony. He elected to believe the police officers and we cannot disturb his finding." [46]

Earlier in *Stathopoulos v. Hanley*,[47] the court held that it was within the province of the examining magistrate "to consider the credibility, weight, and effect" of the testimony of the state's witness "to be such as to render the charge against the petitioner within reasonable probabilities."

*Hanna, Tessler* and *Stathopoulos* indicate that the magistrate must determine credibility of witnesses if he is to determine that there is credible evidence to support a finding of probable cause. But the determination is merely one of plausibility of the story and not general trustworthiness of the witness.

The central approach to the role of the magistrate in determining credibility of witnesses is one of degree. In *Knudson*, the defendant was able to attack the credi-

---

[44] (1950), 257 Wis. 159, 42 N. W. 2d 496.

[45] *Supra*, footnote 43, at page 450.

[46] *Supra*, footnote 44, at page 162.

[47] (1947), 250 Wis. 109, 111, 26 N. W. 2d 259.

bility of the state's witness through what amounted to a cross-examination of her, but was not allowed to call in other witnesses to show variances in her story. There is a point where attacks on credibility become discovery. That point is crossed when one delves into general trustworthiness of the witness, as opposed to plausibility of the story. Because all that need be established for a bindover is probable cause, all that is needed is a believable account of the defendant's commission of a felony.

Applying this standard to the cause now before this court, defense counsel should have been allowed to cross-examine the state's witness on her prior description of the man who shot her husband. This is because the question propounded did not merely go to the witness' general trustworthiness, but also to the plausibility of her description of the defendant, upon which the finding of probable cause rested.

In the instant case, however, the error was harmless, since defense counsel at trial took the strategy of, in effect, admitting that the defendant committed the crime, but arguing that it was third- and not first-degree murder.

### 8. Closing argument.

Although an argument is made here that improper closing argument was made by the prosecutor, no objection to this argument was made at that time. For this reason the objection to the argument was waived and we do not reach the merits in this review.

*By the Court.*—Judgments and order affirmed.